# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JEFFREY HADLEY**
        **Plaintiff,**

    **v.**                    **Case No. 10-C-119**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Jeffrey Hadley seeks judicial review of an administrative decision denying him supplemental security income ("SSI") benefits. See 42 U.S.C. § 1383(c)(3). Because the decision is supported by substantial evidence and free of harmful legal error, I affirm the denial and dismiss plaintiff's action.

## I. PROCEDURAL HISTORY

Plaintiff filed the instant application for SSI on April 11, 2006 (with a protective filing date of March 24, 2006), claiming disability beginning January 1, 1982,[1] due to mental impairments, asthma, and arthritis. (Tr. at 10, 171, 202, 206.) In his papers, plaintiff alleged that he saw things that were not there, heard voices, and believed people were after him. (Tr. at 219-21.) He indicated that he paced the floor most the day, thinking about the people who were after

---

[1]Although plaintiff alleged disability dating back to 1982, the earliest month for which SSI benefits may be paid is the month following the month the application was filed. 20 C.F.R. § 416.335; 20 C.F.R. § 416.501. Plaintiff had filed several previous applications for disability benefits, most of which were denied. (Tr. at 177-78.) He was found eligible for SSI in 1994, but his benefits were apparently later suspended due to his incarceration. (Tr. at 90, 179-80, 242.)

him. At night, he heard them talking about him and how they were going to get him. (Tr. at 224.) He wrote that he rarely bathed and needed reminders to take his medicine. (Tr. at 225-26.) He denied any social activities and said he left the house only with his wife. (Tr. at 228.) When asked about the physical and mental abilities affected by his impairments, he checked every single item on the form's list, including lifting, bending, standing, reaching, walking, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (Tr. at 229.) He wrote that he got along with no one aside from his wife. (Tr. at 230.)

The Social Security Administration ("SSA") denied the application initially (Tr. at 142, 144) and on plaintiff's request for reconsideration (Tr. at 143, 149). Plaintiff sought a hearing before an Administrative Law Judge ("ALJ") (Tr. at 153), and on December 9, 2008, he appeared with counsel before ALJ Karen Sayon (Tr. at 114, 160). The ALJ took testimony from plaintiff and a vocational expert, Beth Hoynik, then issued a written decision dated March 11, 2009 denying plaintiff's application. (Tr. at 10-20.) Plaintiff next sought review by the SSA's Appeals Council, but the Council denied his request (Tr. at 1), making the ALJ's decision the final administrative determination on the application. See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). Plaintiff then filed the instant action for judicial review of the ALJ's decision.

## II. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

Judicial review of an ALJ's decision is limited; the court will reverse only if the decision is not supported by substantial evidence, is based on legal error, or is so poorly articulated as

to prevent meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). In sum, the court will uphold a decision so long as the record reasonably supports it and the ALJ explains her analysis of the evidence with sufficient detail and clarity. Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).

## B.    Disability Standard

The ALJ determines whether a claimant is disabled under a sequential five-step test. See 20 C.F.R. § 416.920(a)(4); Simila v. Astrue, 573 F.3d 503, 512-13 (7th Cir. 2009). Under this test, the ALJ first asks whether the claimant is working, i.e., engaged in "substantial gainful activity" ("SGA"). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572.[2]

If the claimant is not working, the ALJ determines at step two whether the claimant has a "severe" impairment. An impairment is "severe" if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 1521(a).

If the claimant has a severe impairment, at step three the ALJ determines whether the impairment meets or equals one of the impairments considered presumptively disabling by SSA regulations. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In order to meet a Listing, the claimant must present

---

[2]SSA regulations set forth certain monthly earning levels that give rise to a presumption that a job constitutes SGA. See 20 C.F.R. § 404.1574.

evidence showing that he satisfies each of its "criteria." See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999). For example, the Listings of mental impairments consist of three sets of "criteria" – the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. Windus v. Barnhart, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). The B criteria have four components: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, "mild," "moderate," "marked," and "extreme," and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to work. 20 C.F.R. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas. See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

If the claimant's impairment does not meet a Listing, the ALJ must at step four determine whether the claimant can, given his residual functional capacity ("RFC"), continue to perform any "past relevant work."[3] "RFC" is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR

---

[3]Past work is generally considered "relevant" work experience for purposes of step four analysis when it (1) was done within the last fifteen years, (2) lasted long enough for the claimant to learn to do the job, and (3) constituted SGA. See 20 C.F.R. § 404.1565(a); SSR 82-62.

96-8p. In setting RFC, the ALJ considers both the "exertional" and "non-exertional" capacities of the claimant. Exertional capacity, which refers to the individual's strength-related abilities, is typically classified in the categories of "sedentary," "light," "medium," "heavy," and "very heavy" work. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities. See, e.g., Neave v. Astrue, 507 F. Supp. 2d 948, 959 (E.D. Wis. 2007); Patterson v. Barnhart, 428 F. Supp. 2d 869, 885-86 (E.D. Wis. 2006); Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005); Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003).

Finally, if the claimant lacks the RFC to perform his past relevant work (or if he lacks a relevant work history), the ALJ must determine at step five whether the claimant is capable of performing other jobs that exist in significant numbers in the national economy. The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of his limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education, and work experience. However, the ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., mental impairments) substantially reduce his range of

work.  Neave, 507 F. Supp. 2d at 953.

With these standards in mind, I first review the administrative record and the ALJ's decision in this case, then analyze plaintiff's claims of error by the ALJ.

## III.  THE EVIDENCE BEFORE THE ALJ

### A.    Treatment Records

Plaintiff spent much of the relevant time period in the custody of the Wisconsin Department of Corrections ("DOC"), and accordingly many of the treatment records are from the DOC.  The records in the transcript begin with a September 10, 1996, psychiatric report from Dr. J.R. Musunuru, who noted that plaintiff was serving a five year sentence, his second period of incarceration.  Plaintiff complained of sleep problems and at times felt down, with a lack of interest and desire.  However, he denied hearing or seeing things, suicidal thoughts, attempts, or plans.  On exam, he was cooperative, courteous, spontaneous, coherent, and relevant.  His affect was sad, and his mood mildly depressed.  Dr. Musunuru found evidence of mild depression and sleep problems, prescribing Trazodone (a drug use to treat depression)[4] on a trial basis.  (Tr. at 58.)

Records from the Dodge Correctional Institution indicate that plaintiff was treated for asthma and depression with inhalers and Trazodone in 1996.  (Tr. at 48-56.)  On April 2, 1997, following plaintiff's transfer to the Fox Lake Correctional Institution, Dr. Laurens Young prepared a psychiatric report.  Plaintiff reported being on anti-depressant medication since 1995, with a history of substance abuse and chronic dysphoric[5] problems, but he responded

---

[4]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530.

[5]Dysphoria refers to a mood of general dissatisfaction, restlessness, depression, and anxiety.  Stedman's Medical Dictionary 554 (27th ed. 2000).

well to Trazodone.  On mental status exam, plaintiff was somewhat dyshphoric with some trouble sleeping, but he otherwise did pretty well.  Dr. Young continued him on Trazodone.  (Tr. at 57.)

DOC records from 1999 to 2001 indicate that plaintiff was prescribed Sertraline,[6] Trazodone, and Albuterol.[7]  (Tr. at 43-46.)  A DOC "problem list" for the years 1996 to 2002 includes a history of drug abuse; history of asthma, for which plaintiff used an inhaler; psychiatric problems; a painful left knee; and a right knee injury.  However, this list says nothing about the severity of these problems.  (Tr. at 65-66.)  On December 19, 2001, plaintiff underwent a chest x-ray in prison, which was largely normal.  (Tr. at 42.)

It appears that plaintiff returned to prison in January 2005, and a January 14, 2005 DOC mental health screening interview form indicates that plaintiff had been sentenced to four years for theft, his fifth adult incarceration.  Plaintiff reported past treatment for depression and sleep trouble with Zoloft, and he expressed interest in AODA treatment.  He denied crying, suicidal thoughts, or hearing voices or seeing visions others did not perceive.  (Tr. at 252.)  DOC psychologist Carl Cihlar checked the box on the form for "no mental health" need, with follow-up as need, and plaintiff was assigned to the regular population.  (Tr. at 253.)

Subsequent records from the Health Services Unit ("HSU") indicate that plaintiff underwent a routine admission exam on January 20, 2005, with HSU personnel noting his past

---

[6]Sertraline (brand name Zoloft) is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017.

[7]Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000355.

history of treatment for asthma and psychiatric problems. (Tr. at 258.) On March 9, 2005, he visited the HSU complaining of tooth pain. (Tr. at 257-58.) On September 19, 2005, he complained that his asthma was getting worse. However, on exam, his lungs were clear with no active wheezing. He was encouraged to quit smoking. (Tr. at 257.)

A November 25, 2005, DOC psychological services intake file review form lists diagnoses of depression and bi-polar, with medications of Zoloft and Trazodone stopped in 2004. The form recommended mental health follow-up as needed, per offender request or staff referral. (Tr. at 251.)

On December 13, 2005, plaintiff received Tylenol for muscle soreness, but the note does not specify the cause of the problem. (Tr. at 257.) On February 27, 2006, plaintiff was seen regarding his asthma. He reported using Albuterol two to three times per day, and that he woke up wheezing. HSU personnel assessed asthma, mild. (Tr. at 257.)

On May 1, 2006, plaintiff's prison social worker, Ed Steinacker, completed a questionnaire, indicating that plaintiff satisfactorily kept his appointments. He wrote "unknown" in response to questions about plaintiff's hygiene, memory, and unusual or inappropriate mannerisms. (Tr. at 212.) He indicated that plaintiff was cooperative in their dealings and reported no trouble with sleep or appetite. (Tr. at 213.) Steinacker indicated that the DOC determined plaintiff to be in need of substance abuse treatment. (Tr. at 214.)

On May 22, 2006, plaintiff reported dyspnea on exertion.[8] (Tr. at 283, 291-92.) However, by June 8 he reported that he was 90% improved. He also complained of right foot pain, but that too was improving. By June 22, he reported that both conditions were much

_____

[8]Dyspnea refers to shortness of breath or subjective difficulty or distress in breathing. Stedman's Medical Dictionary 556 (27th ed. 2000).

better.  (Tr. at 280.)  On June 28, plaintiff was seen for abdominal pain and constipation.  X-rays showed no obstruction, and he was given mag citrate.  That problem also seemed to resolve by June 29.  (Tr. at 279, 286-90.)

After his release from prison on July 11, 2006 (Tr. at 204, 232), plaintiff sought treatment at Racine Psychological Services, apparently on referral from his probation officer.  At his initial meeting with Mariah Hewitt, Psy.D., on July 25, 2006, plaintiff reported suffering from depression for many years, with mood swings, anger outbursts, and excessive worrying.  He also reported troubling sleeping and vacillating between eating too much or not enough.  He related feelings of paranoia from being locked up so much and said he primarily stayed in his house.  He also reported problems with memory, sadness, and "seeing little black things."  (Tr. at 89, 305, 337.)  Dr. Hewitt found it hard to say whether the latter issue was due to vision problems, not sleeping well, or some form of psychosis, although he did not appear to be psychotic.  (Tr. at 89, 305, 337.)  Plaintiff reported having at least thirty jobs in his life, none lasting longer than three months; he indicated that he got fired or quit because he could not get along with co-workers or bosses.  He also claimed diagnoses of bipolar disorder and paranoid schizophrenia, but Dr. Hewitt saw no indications of those concerns or report of symptoms consistent with those conditions.  (Tr. at 90, 306, 338.)  Plaintiff reported being imprisoned for seventeen of the past twenty-one years, with six periods of confinement.  He reported problems in prison, including disruptive conduct due to his anger and attitude.  (Tr. at 91, 307, 339.)

On exam, Dr. Hewitt found plaintiff well groomed and neatly attired, pleasant and cooperative, and oriented times three.  She saw no signs of a major thought disorder.  His mood appeared moderately dysphoric, and his thought processes overall appeared logical and intact.  (Tr. at 91, 307, 339.)  Dr. Hewitt diagnosed dysthymic disorder, poly-substance

9

dependence in remission, probable personality disorder, NOS, with anti-social and dependent features, with a current GAF of 53.[9]  (Tr. at 91-92, 307-08, 339-40.)  Plaintiff reported prescriptions for Trazodone and Zoloft while incarcerated.  He denied side effects, and he and his wife both believed him to be more calm, better able to rationalize, and more stable on the medications.  Without medications, he rated his depression a 10 on a 1 to 10 scale; with them, he rated it a 3.  Dr. Hewitt planned to have plaintiff continue with her for individual psychotherapy and scheduled him to see a psychiatrist for continued medication management.  (Tr. at 92, 308, 340.)

After cancelling or failing to appear for several appointments, plaintiff returned to Dr. Hewitt on September 12, 2006.  Plaintiff vented about the "system," including the DOC and SSA.  He stated that he was unable to work because he had problems with authority and did not like being told what to do.  He denied any interest in supporting himself with part-time or full-time work and alluded to returning to crime if he did not receive financial assistance because he had to take care of himself.  Dr. Hewitt wrote that plaintiff failed to take responsibility for his own actions; he admitted that his previous crimes were his fault but felt "held back" by the system and entitled to financial compensation.  (Tr. at 86, 304, 336.)

Plaintiff cancelled or failed to appear for several additional appointments with Dr. Hewitt in the fall of 2006, in part due to time spent in DOC custody between October to December 2006 (Tr. at 88, 335), during which the DOC provided him with an Albuterol inhaler and

---

[9]"GAF" stands for "Global Assessment of Functioning."  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others.  Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

10

ibuprofen for headaches (Tr. at 380-81). A DOC intake form, dated October 20, 2006 indicates that plaintiff took Zoloft and Trazodone for depression and sleep. He reported feeling depressed, tense, and sad because of his incarceration, but he denied crying. He indicated that he saw "spiders" but denied auditory hallucinations. (Tr. at 392.) DOC personnel made no abnormal mental status observations and saw no special placement concerns. (Tr. at 393.)

On his release in January 2007, plaintiff agreed to a "zero tolerance" policy for missed appointments with Dr. Hewitt. On February 9, 2007, he reported that he relapsed and used cocaine, resulting in his earlier detention. He again vented about the system and indicated that he had applied for jobs but not been hired due to his record. Plaintiff missed his next session on February 27, his sixth cancellation or missed appointment since starting treatment on July 25, 2006, and as a result was terminated from treatment. (Tr. at 88, 335.)

On February 15, 2007, plaintiff visited the Racine Family Medical Center for his asthma. He reported that he had recently been released from prison, where he took Albuterol and Advair.[10] He indicated that he had run out of Albuterol and wanted a refill. He also requested a nebulizer treatment. (Tr. at 353.) On exam, Dr. Shreyas Rana noted mild wheezing bilaterally. Plaintiff was provided nebulizer treatment and prescribed Advair and Albuterol. (Tr. at 354.)

Plaintiff returned to the Racine Family Medical Center for follow-up on March 6, 2007. (Tr. at 351.) On exam, Dr. Rana noted that plaintiff's lungs were clear, found his asthma controlled, and continued medications. (Tr. at 352.)

---

[10]Advair is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and chronic obstructive pulmonary disease. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001071.

Plaintiff returned to prison in the summer of 2007, and DOC records indicate that he received medications for asthma and depression/PTSD, including Albuterol, Advair, Trazodone, and Sertraline. (Tr. at 59, 63, 64, 87, 93-113.) According to a June 7, 2007, mental health screening interview form, plaintiff reported not currently taking psychiatric medications, as he had in the past. He reported feeling depressed and sad, as his father-in-law had died in May 2006. He reported that he heard voices, with an imaginary friend talking to him, "think it is Jesus." However, he reported no trouble getting along with staff or other inmates, in recent or past incarcerations. (Tr. at 390.) DOC personnel made no abnormal mental status observations and found no special placement concerns. His concentration and affect were unremarkable. (Tr. at 391.)

On June 13, 2007, plaintiff was seen by a student at psychological services, requesting medications for stress and depression. He stated that he had "bipolar paranoid schizophrenia" and reported visual hallucinations of butterflies and flashes of light. He also reported auditory hallucinations that say "you've no business being locked up," and "do something to parole agent." He indicated that he heard these voices all the time, in his head. He also reported feeling edgy and having headaches. He presented as alert and fully oriented, with coherent and logical thought content. He reported playing chess and spending time in the day-room to cope. (Tr. at 389.)

On July 12, 2007, DOC psychiatrist Dr. Toni Ducrest completed a psychiatric report, noting that plaintiff used medications in the past, including Trazodone and Zoloft, sporadically in the community. Plaintiff denied any medical problems but had a history of asthma according to the chart. On mental status exam, plaintiff made good eye contact, displayed no formal thought disorder, and described his mood as "so-so." He denied visual hallucinations but

12

reported vague auditory hallucinations, which he said had been ongoing for many years. He denied being treated for these voices and elected not to be treated for them at this point. He was alert and oriented, and judged to be of average intelligence. Dr. Ducrest's impression was that plaintiff primarily carried a diagnosis of substance abuse, and the symptoms he described, such as auditory hallucinations and mood disorder, were most likely related to an axis II diagnosis. Under axis I, Dr. Ducrest diagnosed cocaine and alcohol dependence, and depressive disorder, NOS, and under axis II anti-social personality disorder. She re-started him on Trazodone and Zoloft. (Tr. at 84-85, 377-78.)

On July 20, 2007, plaintiff was seen by Melissa Caldwell, Ph.D., in response to an interview request, citing difficulties in adjustment. Plaintiff reported that his wife had been diagnosed with cancer, and they spent time discussing coping strategies and ways he could be there for his wife emotionally, if not physically. Plaintiff presented as calm and cooperative, alert and oriented, with an appropriate affect, mood generally positive/euthymic.[11] He denied experiencing perceptual aberrations and displayed no evidence of thought disorder. He was cooperative and engaged throughout the session and appeared receptive to feedback. Dr. Caldwell made a diagnosis of rule out adjustment disorder with mixed mood. (Tr. at 388.)

On July 26, 2007, plaintiff reported itchy eyes and blurred vision, asking for glasses. (Tr. at 364.) On July 30, he complained of worsening asthma symptoms. (Tr. at 364.)

According to an August 7, 2007, DOC psychiatric report completed by Dr. John Pankiewicz, plaintiff was doing well since re-starting on Zoloft and Trazodone. He spoke predominantly of situational issues, stressors related to his wife's health, and his revocation.

---

[11]Euthymia refers to joyfulness, mental peace and tranquility; moderation of mood, not manic or depressed. Stedman's Medical Dictionary 627 (27th ed. 2000).

He denied neuro-vegetative symptoms of depression. On mental status exam, he was alert, oriented, and talkative. He denied a desire to harm himself or others, and displayed no perceptual disturbances, anxiety or depressive symptoms associated with his situational concerns. Dr. Pankiewicz diagnosed poly-substance dependence, depressive disorder, NOS, and anti-social personality disorder, and continued Trazodone and Sertraline. (Tr. at 83, 376.)

On August 31, 2007, plaintiff was seen for asthma follow-up. He stated that he had to use his Albuterol inhaler only twice over the past two weeks, and his asthma was noted to be under good control. (Tr. at 363.)

According to a November 5, 2007, psychological services intake file review by Lawrence Todryk, Psy.D., plaintiff had no suicide history and presented a low risk. His diagnostic history included adjustment disorder with depressed mood. Dr. Todryk recommended treatment as needed, per offender request or staff referral. (Tr. at 387.)

According to a November 30, 2007 DOC form, plaintiff reported taking Trazodone and Sertraline for depression and sleep problems. He reported feeling sad because he was in segregation and reported crying once per month. He denied thoughts of suicide or hearing voices or seeing visions. DOC personnel made no abnormal mental status observations. (Tr. at 386.) Additional DOC notes from June to November 2007 indicate that plaintiff was prescribed Trazodone, Sertraline, Alubterol, and Advair. (Tr. at 78, 79, 370-72.) Notes from November to December 2007 indicate that he continued with Trazodone, Sertraline, Albuterol, and Advair. (Tr. at 369.)

On December 20, 2007, plaintiff underwent a routine admission physical exam, noting a history of asthma but with no problems at the time. He was advised to lose weight. (Tr. at 362.)

On January 28, 2008, DOC psychiatrist Dr. Leslie Gombus completed a report, in which he noted that plaintiff reported getting four to five hours sleep per night, with good appetite but low energy. He reported no auditory or visual hallucinations or paranoia, but had crying spells about every three weeks lasting twenty minutes. On mental status exam, his mood was appropriate and affect animated within the interview situation. He maintained good eye contact with the examiner and was logical and sequential with his responses. (Tr. at 80, 374.) Dr. Gombus diagnosed poly-substance dependence, depressive disorder, NOS, and anti-social personality disorder. Dr. Gombus continued Zoloft and slightly increased Trazodone to improve sleep. (Tr. at 81, 375.)

According to a January 29, 2008 DOC psychological services intake file review form, plaintiff was admitted to Dodge Correctional Institution with a prescription for Trazodone and Sertraline, which he stated was for depression and sleep problems. Plaintiff indicated he had taken psycho-tropic medications for the past eleven years. His suicide risk rate was deemed low, with mental health treatment as needed, per offender request or staff referral. (Tr. at 385.)

On February 11, 2008, plaintiff was seen after another inmate hit him on the head. He was given Tylenol for pain. (Tr. at 360-61.)

In a March 31, 2008 DOC psychiatric report, Dr. Pankiewicz indicated that plaintiff was stable on medications and had generally done well from a perspective of control of symptoms of depression. Plaintiff denied side effects of his medications. On mental status exam, plaintiff was oriented, perhaps a little tired. He denied depression or anxiety, or any desire to harm himself or others. No perceptual disturbance were evident, nor thought disorders. Dr. Pankiewicz diagnosed major depressive disorder, recurrent, and increased plaintiff's Trazodone and Sertraline dosage. (Tr. at 82, 373.)

15

On May 20, 2008, plaintiff complained of sharp pain in his right knee, and DOC personnel noted some swelling on exam.  He was given ibuprofen and a knee sleeve.  (Tr. at 75, 76, 358, 359.)  He was later prescribed Naproxen for right knee pain and swelling, and an x-ray was ordered.  (Tr. at 76, 77, 359.)  The x-ray revealed no fracture, dislocation, or focal destructive bony lesions.  Mild degenerative changes were evident in the medial joint compartment and femoropatellar joint, but there was no significant joint effusion.  (Tr. at 379.)

On May 22, 2008, plaintiff asked to see a psychologist due to nightmares and "these people who keep talking to me."  (Tr. at 383.)  According to a May 27 note, plaintiff reported having nightmares and hearing voices, specifically of his parents saying negative things about him.  He denied current suicidal and homicidal ideation.  He was encouraged to participate in a depression and anxiety group.  The examiner, Dr. Todryk, found plaintiff to be cooperative in responding to questions, with appropriate hygiene.  He tended to avoid eye contact, his affect was constricted, and his mood depressed.  Regarding the voices, Dr. Todryk indicated that they appeared to be more of his conscience than hallucinations.  Dr. Todryk assessed an adjustment disorder.  (Tr. at 382.)

On June 17, 2008, plaintiff was seen again regarding his knee, noting some relief from the Naproxen.  Personnel assessed right knee degenerative joint disease, advised plaintiff to obtain an elastic knee brace, gave him a restriction for a low bunk, and continued Naproxen. (Tr. at 74, 357, 366.)

In June and July 2008, plaintiff agreed to participate in the depression and anxiety group, but he missed five of eight sessions.  (Tr. at 384.)  He was released from prison on August 19, 2008.  (Tr. at 249.)

On September 4, 2008, plaintiff saw Dr. Vincenzo Susini at the Racine Family Medical

Center, for refill of his asthma (Albuterol, Advair), psychiatric (Sertraline, Trazodone), and arthritis (Naproxen) medications.  Plaintiff stated that he had gained sixty pounds while in prison, which he believed contributed to worsening asthma.  He admitted smoking 1 ½ packs of cigarettes per day for thirty-five years, but he denied alcohol or drug use for the past three years.  (Tr. at 348.)  On a review of symptoms, plaintiff had no fever, fatigue, night sweats, vision changes, headaches, hearing loss, cough, audible wheeze, chest pain or palpitations.  He was also negative for back pain but complained of moderately severe bilateral knee pain.  His medications were refilled and a full physical recommended.  (Tr. at 349.)

On September 18, 2008, Dr. Susini completed a full physical exam.  Plaintiff reported no new complaints since his last visit (Tr. at 344) but stated that if he "does not have his meds he goes 'crazy.'"  (Tr. at 345.)  He also complained of moderately severe bilateral knee pain.  On physical exam, his lungs were clear, and his extremities appeared normal with no edema or cyanosis.[12]  He was alert and oriented, with no unusual anxiety or evidence of depression.  (Tr. at 345.)  Dr. Susini referred him to the asthma clinic.  (Tr. at 346.)

On October 22, 2008, plaintiff returned to Dr. Susini, seeking a psychiatric referral but with no other issues or complaints.  (Tr. at 341.)  Dr. Susini again noted no vision changes, headaches, hearing loss, cough, or audible wheeze, and plaintiff's respirations were regular.  On physical exam, plaintiff's lungs were clear.  Dr. Susini assessed "unspecified psychosis" and made a psychiatric referral.  (Tr. at 342.)

According to a November 25, 2008, initial assessment profile from Wheaton Franciscan

---

[12]Edema refers to an accumulation of an excessive amount of water fluid in cells, Stedman's Medical Dictionary 566-67 (27th ed. 2000), and cyanosis to discoloration of the skin due to deficient oxygenation, id. at 441

Healthcare, plaintiff reported a history of PTSD and depression, with current symptoms of depression, anxiety, isolation, poor sleep and appetite, and mood swings. He was not on medication at the time. He also reported pain in his knees, relieved by Naproxen. (Tr. at 394-95.) On mental status exam, he appeared oriented times three with normal attention and recall. He displayed average grooming and fair judgment. His attitude was cooperative-guarded, with normal eye contact. His speech was also normal, and his affect full. His mood was anxious and depressed, but his thought process logical. He complained of auditory but not visual hallucinations. The doctor diagnosed major depressive disorder and rule out anti-social personality traits, with a GAF of 53, and prescribed Trazodone and Sertraline. (Tr. at 396-97.)

## B. SSA Consultants' Reports

The SSA also arranged for several doctors to review plaintiff's file and one to conduct a consultative examination. Specifically, on May 15, 2006, Dr. Zhen Lu reviewed the medical record and found no evidence of a severe physical condition. (Tr. at 261.) On May 18, 2006, Michael Mandli, Ph.D, completed a psychiatric review technique form, finding no severe mental impairment. (Tr. at 262.) Dr. Mandli noted plaintiff's history of depression (Tr. at 265), but under the B criteria he found mild limitation in ADL's and social functioning; no limitation in concentration, persistence, and pace; and no episodes of decompensation (Tr. at 272). He also found no evidence of the C criteria. (Tr. at 273.)

On August 22, 2006, Dr. Kalpana Rao completed a consultative examination. (Tr. at 293.) When asked why he believed he qualified for social security benefits, plaintiff complained of long-term depression. He said he did not like going places, and felt stress and upset when he left the house. (Tr. at 293-94.) Dr. Rao indicated that he received the DOC psychological

services intake file review, which noted diagnoses of depression and bipolar, and treatment with Zoloft and Trazodone; plaintiff's adult function report, in which he complained of paranoia, hallucinations, and problems with a long list of physical functions; and the questionnaire from plaintiff's prison social worker. (Tr. at 294.) However, the Disability Determination Services ("DDS") did not provide Dr. Rao with plaintiff's mental health treatment records. (Tr. at 297.)

Plaintiff reported being sober since his release from prison, but Dr. Rao noted that plaintiff's "demeanor appeared to be somewhat fragile which may be due to being high when he came to the interview." (Tr. at 297.) Plaintiff denied taking drugs prior to the interview. (Tr. at 297.) Asked about his medical history, plaintiff indicated that he had pain in his feet due to diabetes. However, he received no treatment for that due to lack of health insurance. Regarding his social history, plaintiff reported dropping out of high school but later obtaining a GED. Married for three years, he had seven children between the ages of twenty-six and seventeen. He reported that he lived with his wife and three children. His work history was inconsistent, and he appeared to have minimal work skills. His longest job was three months, several years ago. He reported trouble keeping a job due to difficulty getting along with others and a history of altercations with authorities. (Tr. at 298.)

On mental status exam, plaintiff displayed satisfactory personal hygiene. His mood was somewhat irritable, and he appeared easily agitated but not hostile. He maintained poor eye contact, his approach to the interview was somewhat apathetic, and his level of motivation appeared somewhat low. His demeanor was guarded and evasive at times. He did not display any difficulty following instructions but had to be redirected at times. His answers were relatively well formulated. (Tr. at 298.) His mood seemed somewhat dysphoric with low energy, his affect was irritable, and at times he appeared to space out (which Dr. Rao thought

may be due to possible drug use prior to the interview).  However, he did not display any significant decompensation during the evaluation.  He displayed no apathy, distress, undue frustration, hostility, anger, or unusual emotional expressions.  (Tr. at 299.)  Plaintiff reported possible visual and auditory hallucinations, but Dr. Rao found it unclear whether these were psychotic in nature or due to drug use.  His stream of mental activity appeared to be normal, and his verbalizations were adequately organized, coherent, logical, and sequential, and he displayed no unusual or bizarre thought processes.  (Tr. at 299.)  Asked about his symptoms, defendant reported poor sleep, headaches, agitation, irritable mood, and getting into verbal and physical altercations.  He denied appetite problems or any aggressive thoughts or homicidal intent despite his impulse control problems.  (Tr. at 299.)

Dr. Rao found plaintiff well oriented to time, place, and person.  He displayed no significant long-term memory problems, was able to provide information regarding significant life events, and was able to score well on the recent memory test.  (Tr. at 299.)  However, his ability for abstract thinking and conceptual understanding was unclear.  He was able to identify the current president as well as past presidents, but when asked the number of weeks in a year said 42.  (Tr. at 300.)

Regarding ADL's, plaintiff indicated that he cared for his personal needs but did no chores around the house and spent time watching TV.  Due to his poor impulse control and episodes of being argumentative, he had difficulty maintaining relationships.  (Tr. at 300.)  Dr. Rao diagnosed rule out poly-substance abuse, rule out psychotic disorder, NOS, rule out anti-social personality disorder, and rule out malingering.  His GAF was unclear.  Due to possible unreliable response patterns, Dr. Rao found it difficult to draw any conclusions about plaintiff's memory and concentration problems.  Regarding plaintiff's general ability to understand,

20

process, and carry out instructions in the work environment, Dr. Rao wrote that no conclusions could be drawn with any certainty due to the possibility of unreliable test performance. He found it possible plaintiff was exaggerating his symptoms, malingering, or minimizing his drug use. Dr. Rao indicated that no history of plaintiff's psychiatric treatment had been provided to substantiate any of his claims. Plaintiff appeared to be unreliable in his responses and no collateral source was interviewed. (Tr. at 301.)

On October 5, 2006, Keith Bauer, Ph.D, completed a psychiatric review technique form, evaluating plaintiff under Listing 12.04, Affective Disorders, 12.08, Personality Disorders, and 12.09, Substance Addiction Disorders. (Tr. at 313.) Under the B criteria, he found "moderate" limitation of ADL's, social functioning, and concentration, persistence, and pace, with no episodes of decompensation. (Tr. at 323.) He found no evidence to establish the presence of the C criteria. (Tr. at 324.) In an accompanying mental RFC report, Dr. Bauer found moderate limitation in eight categories, no significant limitation in twelve. (Tr. at 309-10.)

## C.  Hearing Testimony

At the hearing, plaintiff testified that he was forty-seven years old with a GED-level education. (Tr. at 119.) He lived with his wife, who supported him financially. (Tr. at 119-20.) He testified that he had not worked since he filed his application and could not recall when he last worked. (Tr. at 120.) Plaintiff testified to a substantial number of short-term jobs, which he could not maintain due to his attitude, anger, and trouble dealing with authority. (Tr. at 128-29.) He also testified to problems with memory, concentration, and staying on task. (Tr. at 131.) He indicated that he had spent much of life, seventeen out of twenty years, in prison for theft and revocation of probation. (Tr. at 121.) He claimed that he spent about twelve of those years in prison in solitary confinement due to mental breakdowns and disciplinary problems.

(Tr. at 133-34.) He indicated that he did not work in prison because the prison psychiatrists determined that he was not capable of working due to his mental disorders. (Tr. at 121.)

Asked to identify his physical impairments, plaintiff named arthritis and asthma. (Tr. at 121.) He testified that he had arthritis in his knees, ankles, and wrists. He testified that his asthma had gotten worse in the past few years. (Tr. at 122.) Plaintiff testified that he last used illegal drugs in May 2007. (Tr. at 122.) Prior to that, he used alcohol and cocaine daily. (Tr. at 123.)

When asked to describe how his mental problems affected him, plaintiff indicated that he had a hard time coping and stayed at home. He did not like being around people other than his wife and grandchildren. (Tr. at 123.) He testified that he had twelve grandchildren, ages four to eleven, who visited him often. (Tr. at 124-25.) He indicated that he had been on psychiatric medications for many years, which did help him maintain balance. (Tr. at 124.) However, he complained of side effects, including headaches, weakness, and memory loss. (Tr. at 130.) He also complained of trouble sleeping, stating that he slept two to three hours per night. (Tr. at 131.)

When asked to describe his daily activities, plaintiff said that he awoke, his wife made him breakfast, and he then sat around the house or accompanied his wife to therapy related to her recent stroke. (Tr. at 125.) Plaintiff testified that he did no household chores – his wife handled them. He indicated that he had no friends in the community (Tr. at 126), but did attend church and bible study weekly (Tr. at 132). Plaintiff testified that he could lift ten to fifteen pounds (Tr. at 126), sit for twenty to thirty minutes due to his knees, stand fifteen to twenty minutes, and walk about half a block (Tr. at 127). He also complained of pain in his hands and wrists due to arthritis. (Tr. at 127.)

The VE testified that, based on a review of the record, plaintiff appeared to have no past relevant work.[13] (Tr. at 135-36.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, with a high school equivalent education and no work experience, limited to medium work involving no kneeling, only simple routine repetitive tasks, no concentrated exposure to respiratory irritants, and no public contact. The VE testified that such a person could work as a production worker (10,000 jobs in the state of Wisconsin) and hand packer (17,000 jobs in the state of Wisconsin). (Tr. at 136.) If the person could have only occasional contact with supervisors or co-workers, the answer was the same. However, if the person could have no contact with the public, supervisors, or co-workers, no jobs could be performed. (Tr. at 137.) The VE indicated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 138.)

## IV. ALJ's DECISION

Following the sequential five-step procedure, the ALJ determined that plaintiff had not engaged in SGA since the date of his application, and that he suffered from the severe impairments of knee pain, obesity, asthma, dysthymic disorder, personality disorder with anti-social and dependant features, and a substance abuse disorder, none of which met or equaled a Listing. (Tr. at 12.) Regarding plaintiff's mental impairments, under the B criteria the ALJ found mild restriction of ADL's; moderate restriction of social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 13.)

The ALJ then concluded that plaintiff retained the RFC for medium work, with no

---

[13]According to SSA records, between 1986 and 2008 plaintiff never earned more than $3900 in a year. In twelve of those twenty-four years he earned nothing. (Tr. at 176.)

kneeling or concentrated exposure to respiratory irritants, only simple non-complex instructions and routine repetitive tasks, with no public contact. (Tr. at 14.) The ALJ considered plaintiff's testimony as to his mental and physical limitations, and found that while his impairments could cause the alleged symptoms, plaintiff's statements about the severity of those symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. at 15.) Specifically, with regard to plaintiff's asthmatic complaints, the ALJ noted that plaintiff had mild wheezing after his release from prison in February 2007, which resolved after he re-started on medications. Regarding his knee complaints, the ALJ noted that x-rays revealed only mild degenerative changes, and that his pain was managed with medication with good results. Regarding his mental symptoms, the ALJ noted that plaintiff's symptoms improved with medication, and that while he claimed inability to get along with co-workers, supervisors, and authority figures, he also reported that he had a great marriage and got along well with his family. The ALJ also noted that Dr. Hewitt saw no signs of a major thought disorder, with moderately dysphoric mood and logical, intact thought processes. Dr. Hewitt offered provisional diagnoses of dysthymic disorder; poly-substance dependence, in full remission; and probable personality disorder, NOS, with anti-social and dependent features; and a GAF of 53, reflective of only moderate symptoms and impairment in functioning. (Tr. at 15.)

The ALJ also discussed Dr. Rao's August 2006 consultative exam, in which the doctor found plaintiff somewhat irritable and easily agitated, with poor eye contact, an apathetic approach, and a guarded, evasive demeanor. However, plaintiff had no difficulty following instructions, and while he at times needed redirection to stay on task his answers were relatively well formulated. His stream of mental activity was normal, and his verbalizations adequately organized, coherent, logical, and sequential. He displayed no significant long-term

24

memory problems and scored well on a recent memory test.  Dr. Rao offered several "rule out" diagnoses, stating that he was unable to reach conclusions regarding plaintiff's ability to understand, remember, process, and carry out instructions due to the possibility of unreliable test performance; he also opined that plaintiff was exaggerating his symptoms or malingering, or minimizing his drug abuse at the time of the evaluation.  (Tr. at 16.)

The ALJ further reviewed plaintiff's medical records from the Department of Corrections, which reflect that plaintiff complained of stress and depression while incarcerated in 2007.  However, it was determined that his symptoms were largely related to substance abuse, and by March 2008 he was noted to be stable on medication.  On exam at that time, plaintiff denied symptoms of depression and had no perceptual disturbances or evidence of thought disorder.  Following his release from prison, plaintiff sought further treatment, complaining of trouble sleeping, irritability, and low energy.  However, on exam his attention and recall were normal, grooming was appropriate, attitude cooperative if guarded, eye contact and speech normal, and thought process logical.  (Tr. at 16.)  The doctor diagnosed major depressive disorder, rule out anti-social personality traits, with a GAF of 53 (again, reflective of moderate symptoms), with medication management recommended.  (Tr. at 17.)

Based on this evidence, the ALJ found claimant's allegations of inability to work less than credible.  She gave plaintiff the benefit of the doubt by physically limiting him to medium work, with no kneeling or exposure to respiratory irritants, despite the fact that the state agency consultant found no severe physical impairment.  She found that no greater limitations were warranted: plaintiff's asthma was well-controlled with medication, he received no significant treatment for arthritis, and knee x-rays revealed only mild degenerative changes.  (Tr. at 17.)  Further, while plaintiff had a history of mental and substance abuse problems, he appeared to

exaggerate the severity of the problems he experienced in prison. The ALJ also noted that plaintiff was able to get along with the examiners and his family, attended church and bible study regularly, and improved with medication. (Tr. at 17-18.) The state agency mental consultants concluded that plaintiff was limited only to unskilled work, but on a review of the entire record the ALJ concluded that plaintiff was more limited and added a restriction of no public contact. She otherwise gave great weight to the consultants' opinions. (Tr. at 18.) The ALJ further noted that no doctor had assigned greater limitations than set forth in her RFC. And, while plaintiff made vague complaints at the hearing, including that he had never held a long-term job and had been fired due to his attitude or problems dealing with others, he was unable to provide any specifics. The ALJ also noted that despite his alleged inability to get along with others, his grandchildren regularly visited, and he regularly attended church and bible study. His claim that he spent most of his prison time in solitary or on lock-down due to his mental problems was not supported by the DOC records. Finally, the ALJ noted the consultative examiner's suggestion of malingering. (Tr. at 18.)

The ALJ then determined that plaintiff had no past relevant work, so she proceeded to step five, where she concluded, based on plaintiff's age, education (high school equivalent), and RFC, that jobs existed in significant numbers that he could perform. (Tr. at 18.) Noting that plaintiff's non-exertional limitations made reliance on the Grid improper, the ALJ relied on the VE's testimony that a person with plaintiff's characteristics could perform occupations such as production worker (10,000 jobs in Wisconsin) and hand packer (17,000 jobs in Wisconsin). The ALJ noted the VE's testimony that even if plaintiff were limited to only occasional contact with co-workers and supervisors, it would have no effect on these jobs. The ALJ therefore determined that plaintiff's claim failed at step five, and she accordingly found him not disabled.

26

(Tr. at 19.)

## V.  DISCUSSION

In this court, plaintiff argues generally that the ALJ's decision is unsupported by substantial evidence.  More specifically, he argues that Dr. Rao's consultative examination report, prepared without access to plaintiff's treatment records, violates SSA regulations, and that the ALJ erred in evaluating credibility.

### A.    Substantial Evidence

In arguing that the ALJ's decision is unsupported by substantial evidence, plaintiff faces an uphill battle.  Smith v. Apfel, 231 F.3d 433, 439 (7th Cir. 2000).  The court deferentially reviews the ALJ's factual determinations, affirming if a reasonable person could accept the evidence as adequate to support her conclusions.  Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The court must review the entire record, including both the evidence that supports as well as the evidence that detracts from the ALJ's conclusions, but it may not displace the ALJ's judgment by reconsidering facts or evidence, or making independent credibility determinations.  Simila, 573 F.3d at 513.  And, while the ALJ must build a logical bridge from the evidence to her conclusion, she need not provide a complete written evaluation of every piece of testimony and evidence in the record.  Haynes, 416 F.3d at 626.

As discussed above, the ALJ provided a thorough review of the evidence in this case, documentary and testimonial, and plaintiff fails to persuasively argue that her resulting conclusions are unreasonable or that she skipped over important evidence supporting his claim.  Plaintiff notes his substantial history of psychiatric treatment, both while incarcerated

and in the community, and contends that the medical evidence confirms a severe mental impairment. The ALJ did not disagree; she found severe mental impairments and limited plaintiff accordingly.

Plaintiff contends that the records from Racine Psychological Services (Dr. Hewitt) indicate that he "is unable to work because he has problems with authority and does not like being told what to do." (Pl.'s Br. at 8.) The note actually states: "Client is unable to work because he said he has problems with authority and doesn't like being told what to do." (Tr. at 304, emphasis added.) The next line of this note states that plaintiff: "Denied any interest in supporting himself w/ part time or full time work." (Tr. at 304.) Plaintiff cites no opinion evidence from Dr. Hewitt or any other treating professional indicating that he cannot work, due to mental or any other impairments, and an ALJ need not find disability based on the claimant's subjective allegations.[14]

It is true, as plaintiff notes, that Dr. Hewitt diagnosed dysthymic disorder, assigned a GAF of 53, and recommended medication and therapy. The ALJ noted this as well, largely adopting Dr. Hewitt's findings as to plaintiff's severe mental impairments. But the ALJ also explained that a GAF score of 53 is reflective of only moderate symptoms and impairment in functioning. (Tr. at 15.) The ALJ further noted Dr. Hewitt's observations that plaintiff was appropriately dressed and groomed; pleasant, cooperative, and oriented times three; with no signs of a major thought disorder, and logical, intact thought processes. (Tr. at 15.) Plaintiff

---

[14]Even if the quoted treatment note could be construed as opinion evidence from Dr. Hewitt, whether the claimant is "disabled" or "unable to work" is one of those ultimate issues reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(1). Accordingly, "a claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work." Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).

fails to explain how the ALJ erred in evaluating this evidence; indeed, it appears that the ALJ's decision is largely consistent with Dr. Hewitt's findings. As the ALJ also noted – and as plaintiff admitted to Dr. Hewitt – he responded well to medication.

Based on my review of the entire record, I find the ALJ's decision supported by substantial evidence.

## B.  Dr. Rao's Report

Plaintiff next argues that the consultative examination and report by Dr. Rao violated SSA regulations. Specifically, he notes that the state DDS failed to provide Dr. Rao with all of his medical records, preventing Dr. Rao from making a definitive diagnosis or drawing conclusions as to plaintiff's mental ability to work. See 20 C.F.R. 416.919n(b) ("The medical report must be complete enough to help us determine the nature, severity, and duration of the impairment, and your residual functional capacity[.]"); 20 C.F.R. § 416.917 ("We will . . . give the examiner any necessary background information about your condition."). He contends that the SSA violated its duty to review the report for completeness and to re-contact the examiner for missing information. See 20 C.F.R. § 416.919p(b) ("If the report is inadequate or incomplete, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.").

However, plaintiff cites no authority for the proposition that the agency's failure to provide a consultative examiner with all extant medical records at the initial or reconsideration levels results in legal error requiring the reversal of a later ALJ decision based on a complete record. Nor does he show that reversal is required in his case.

First, despite being represented by counsel, plaintiff did not did not ask the ALJ to re-

contact Dr. Rao or schedule another consultative examination.[15] <u>See</u> <u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir.1988) (stating that when a claimant is represented by counsel the ALJ is entitled to presume that he has made his best case). Nor does plaintiff contend that the inadequacy of the record was so clear that the ALJ should have done this on her own. <u>See</u> <u>Tom v. Barnhart</u>, 147 Fed. Appx. 791, 793 (10th Cir. 2005) ("[W]hen, as here, the social security claimant is represented at the hearing by counsel who fails to request a consultative exam, the ALJ's duty is triggered only when the need for a consultative exam is clearly established in the record.") (internal quote marks omitted); <u>see also</u> <u>Eichstadt</u>, 534 F.3d at 668 ("The claimant bears the burden of producing medical evidence that supports [his] claims of disability.").

Second, plaintiff does not argue that the ALJ failed to collect all pertinent medical records, or that the record before the ALJ was inadequate or incomplete. The ALJ need not re-contact medical sources when the record before her is sufficient to decide disability. <u>See</u> <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 857 (N.D. W. Va. 2009) ("An ALJ is required to re-contact medical sources only when the evidence before [her] is inadequate to determine whether the Claimant is disabled."); <u>Mullins v. Astrue</u>, No. 08-200, 2009 WL 982064, at *2 (E.D. Ky. Apr. 13, 2009) (explaining that an ALJ's duty to re-contact the consultative examiner under 20 C.F.R. § 416.919p(b) is not triggered unless the evidence in the record is inadequate or incomplete).

Third, while plaintiff is able to point to evidence of psychiatric treatment preceding the consultative examination, he fails to persuasively explain how such evidence would have

---

[15]Aside from requesting more time to submit the records from plaintiff's November 2008 evaluation, which the ALJ allowed, counsel raised no issues with the record. (Tr. at 116-17.)

swung Dr. Rao's opinion in his favor. Indeed, in his brief he states only that this evidence "could have changed" Dr. Rao's opinion. (Pl.'s Br. at 10.) The ALJ specifically considered all of the evidence plaintiff cites, nevertheless finding plaintiff not disabled. The ALJ accepted, based in part on these records, that plaintiff had received mental health treatment, that he had a severe mental impairment, and that his mental ability for work was compromised, yet nothing in those records convinced her that he was disabled, a reasonable conclusion supported by substantial evidence.

Finally, even if it could be concluded that an ALJ's reliance on a consultative report prepared without access to all medical evidence constitutes legal error, in this case it would be, at most, harmless error. See Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (holding that the doctrine of harmless error is fully applicable to judicial review of administrative decisions). In her decision, the only portions of Dr. Rao's report the ALJ relied upon were those based on the testing he performed and the observations he made. (Tr. at 16, 17.) The ALJ did not rely on or hold against plaintiff Dr. Rao's inability to reach conclusions due to the absence of medical records. Nor did the ALJ rely solely on Dr. Rao. As noted above, she thoroughly discussed the medical evidence, including the records from plaintiff's treating sources, as well as the reports from the state agency reviewing consultants (assigning great weight to those opinions). (Tr. at 18.) The ALJ noted in her decision – and plaintiff does not now dispute – that no doctor, treating or consulting, assigned greater limitations than those found in her RFC.[16]

---

[16]Plaintiff notes in his reply brief that under SSR 96-6p the ALJ must consider and evaluate any assessment of the claimant's RFC by a psychological consultant. The ALJ complied with that directive in this case, discussing all of the consultants' reports. Plaintiff also notes that ALJs are not doctors, which is why the Commissioner arranges for consultants to provide guidance on medical issues. In some cases, he notes, the consultative examination report provides the only guidance on the RFC assessment. But that is not so in this case; as

(Tr. at 18.)

For these reasons, I find no reversible error regarding Dr. Rao's report.

## C.    Credibility

Plaintiff also argues that the ALJ erred in evaluating the credibility of his allegations.  In considering a claimant's statements about pain or other disabling symptoms, the ALJ follows a two-step process.  See SSR 96-7p.  First, the ALJ must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms.  If not, the symptoms cannot be found to affect his ability to work.  Second, if the ALJ finds that the claimant has an impairment that could produce the alleged symptoms, the ALJ must determine the extent to which they limit his ability to work.  SSR 96-7p.  In making this determination, the ALJ may not discredit a claimant's statements based solely on a lack of support in the medical evidence.  Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009).  Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The ALJ must provide specific reasons for the credibility determination, grounded in the evidence and articulated in the decision.  See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).  However, if the ALJ substantially complies with these requirements, the court will

discussed above, the ALJ had before her a sufficient record to decide the case.

afford her credibility determination special deference, reversing only if it is "patently wrong." E.g., Castile v. Astrue, No. 09-3917, 2010 WL 3188930, at *5 (7th Cir. Aug. 13, 2010).

As discussed above, the ALJ provided a thorough evaluation of plaintiff's credibility, ultimately finding his allegations less than credible. (Tr. at 17-18.) In so finding, she considered the relevant factors, including the opinion evidence, the objective medical evidence, plaintiff's treatment history, his response to treatment, his substance abuse, and his daily activities. She also considered the vagueness of his claims and their inconsistency with the other evidence of record. Specifically, she noted his inability to provide any specifics as to his alleged problems holding a job due to conflicts with others; the lack of support in DOC records for his claim to have spent most of his prison time in solitary due to his mental problems; and his ability to get along with his family and regularly attend church and bible study, despite his alleged reclusiveness and obstreperousness. She also noted Dr. Rao's suggestion of malingering. (Tr. at 17-18.)

In his brief, plaintiff summarizes some of the evidence recording his complaints. Specifically, he notes that he complained to Dr. Gombus of lack of sleep, low energy, and fair concentration; he sought treatment through the DOC due to nightmares and voices; and he reported nightmares, hearing voices, trouble sleeping, and trouble getting along with others in a function report to the SSA. But just because plaintiff made such complaints at various points does not mean that the ALJ was required to accept his allegations. Indeed, at various other points he denied such symptoms. (Tr. at 58, 252, 374, 376, 386, 388, 390.) Plaintiff also notes that doctors diagnosed him with depression and assigned GAF scores in the 50s. But the ALJ accepted that plaintiff suffered from severe mental impairments and included specific mental limitations in the RFC. It is also important to note that the ALJ did not fully discount plaintiff's

33

statements, particularly regarding his ability to get along with others, as she limited him to no public contact, a restriction greater than what had been recommended by the consultants. (Tr. at 18.)[17]

Given her thorough review of the record under the appropriate standards, I cannot find the ALJ's credibility determination patently wrong.[18]

## VI. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of August, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[17]Even if plaintiff could have only occasional contact with co-workers and supervisors, his claim failed at step five according to the VE's unchallenged testimony.

[18]Although plaintiff does not raise the issue, I do note that on page 6 of her decision (Tr. at 15) the ALJ employed the sort of boilerplate credibility language criticized by the Seventh Circuit in cases like Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010) and Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003). However, any error in using such language is harmless in this case because, as discussed above, the ALJ went on to provide very specific reasons for finding plaintiff's allegations not credible.